IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ELOISE HUGHES, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COMMISSIONER OF SOCIAL SECURITY, )<br>)<br>Defendant. )<br>) | Case No.: 04-665-DGW |

**ORDER**

This matter is before the Court pursuant to SDIL-LR 9.1 regarding the disposition of Social Security cases in this District. Eloise Hughes (hereinafter "Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act, as amended 42 U.S.C. 405(g) (hereinafter "§ 405(g)"), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act. For the reasons set forth below, the final decision of the Commissioner of Social Security denying benefits is **AFFIRMED**. The case is **DISMISSED WITH PREJUDICE**.

**BACKGROUND**

**Administrative Proceedings**

Plaintiff filed an application for SSI on December 1, 1997, alleging that she became unable to work on January 1, 1994[1] (Transcript of Administrative Record (hereinafter "Tr.")

---

[1] Plaintiff filed a previous application for SSI on September 2, 1994 (Tr. 38). On May 31, 1996, Administrative Law Judge R. Neely Owen issued a written opinion finding Plaintiff was not disabled (Tr. 44). This ruling was not appealed and stands as the final ruling as to Plaintiff's 1994 application (Tr. 210). ALJ Owen found that the doctrine of res judicata precludes consideration of Plaintiff's disability status before May 31, 1996 (Tr. 210, 235).

210).  The claim was denied initially on January 15, 1998 (Tr. 47), and upon reconsideration on May 14, 1998 (Tr. 52).  A hearing was held on January 6, 1999 (Tr. 167), where Administrative Law Judge (ALJ) Edward G. Hoban presided; thereafter, he issued an unfavorable opinion on May 27, 1999 (Tr. 26).  The Appeals Council denied Plaintiff's request for review on November 8, 2000 (Tr. 3), and Plaintiff thereafter appealed to this Court under § 405(g) for review (Tr. 210); Hughes v. Massanari, 00-cv-4305-GPM.

Several months later, both parties submitted to the Court a Stipulated Motion to Enter Judgment Reversing the Commissioner's Decision with Remand to the Agency for Further Proceedings (Tr. 277-278).  On October 30, 2001, this Court granted the stipulated motion, ordered a remand, and instructed the ALJ to reassess the Plaintiff's residual functional capacity without applying Acquiescence Ruling 98-4(6) or the Sixth Circuit case of Drummond v. Commissioner of Social Security, 126 F.3d 837 (1997).  It further instructed the ALJ to specify the frequency that Plaintiff must alternate positions, and directed the ALJ to obtain supplemental vocational expert testimony (Tr. 275).

On March 19, 2002, the Social Security Administration vacated the final decision of the Commissioner and remanded the case to an ALJ for further proceedings consistent with Court's order (Tr. 273).  On remand, the case was sent to an ALJ with instructions to allow Plaintiff to appear at a new hearing, develop the record pursuant to 20 C.F.R. §§ 416.912-416.918 (2002), and issue a new decision (Tr. 273).

A new hearing was held on November 26, 2002 (Tr. 232), and ALJ Gary A. Flenner thereafter issued an unfavorable decision on May 21, 2003 (Tr. 218).  The Appeals Council

denied Plaintiff's request for review on August 28, 2004 (Tr. 192), and Plaintiff then filed a complaint with this Court on September 16, 2004.

**Statement of Facts**

Plaintiff was thirty-nine years old at the time of her December 1, 1997 application (Tr. 64). She was a high school graduate with nine months of college education. Previously, Plaintiff was employed as a maintenance person and as a personal caretaker (Tr. 74, 98, 211). However, Plaintiff last worked in November of 1992 (Tr. 74, 79).

In Plaintiff's Disability Report, dated December 3, 1997, she stated that it was her medical condition that caused her to stop working on November 1, 1992 (Tr. 70). Plaintiff claimed she suffered from arthritis in her hip, legs, arms, and back, as well as high blood pressure (Tr. 70).

*Treating Physician Examinations*

Treatment notes from the Plaintiff's treating physicians at the Community Health and Emergency Services, Inc. from June 27, 1996 to April 23, 2002, evidence a long-standing history of osteoarthritis, allergic rhinitis, and hypertension (Tr. 124-125, 149, 152, 288). Those that treated Plaintiff include Internist Jesusa Palines, M.D., who was her treating physician from June 1996 to May 2001 (Tr. 125, 292), and internist Lalaine Ramirez, M.D., who became her treating physician in July 2001 (Tr. 291). Dr. Ramirez did, however, treat Plaintiff twice before becoming her treating physician: once in September of 1998 (Tr. 148) and again in May of 1999 (Tr. 299).

These treating physicians prescribed Plaintiff various medications to treat her ailments. To treat her hypertension, they prescribed hydrochlorothiazide, avapro, and univasc (Tr. 112-

125, 146-152, 288-303).  For Plaintiff's allergic rhinitis, they prescribed Claritin and Beconase (Tr. 112-125).  To treat the pain that Plaintiff frequently complained about in her back, hips, and knees, the treating physicians routinely diagnosed her pain as "chronic pain syndrome" and wrote several prescriptions (Tr. 125, 123, 122, 152, 148, 147, 303, 299, 294, 290, 288).  Initially, Plaintiff was prescribed Daypro for her pain (Tr. 112-125), but this was eventually replaced with other medications including Lodine, Flexeril, Vioxx, and Tylenol #3 (Tr. 146-152, 288-303).   Plaintiff frequently complained of cold symptoms or a cough, and was prescribed a nasal inhaler, Tavist D, and Daypro (Tr. 121, 119, 150, 152, 290, 298, 299, 300, 302).

On February 13, 1996, G.A. Pjura, M.D., evaluated a computerized tomography (CT) scan of Plaintiff's lumbar spine (Tr. 142).  Dr. Pjura found "no evidence of severe disc bulges or protrusions compressing the thecal sac." (Tr. 142).  He did, however, find moderate neural foraminal stenosis bilaterally at the LS-S1 level (Tr. 142).  Dr. Pjura also found "degenerative changes in the right SI facet joint with focal calcific density in the spinal canal adjacent to the joint" which "could influence the descending S1 nerve root." (Tr. 142).  He recommended a follow-up CT myelogram or MR evaluation if the report's findings "correlate to the patient's clinical symptoms." (Tr. 142).

On November 24, 1997, Plaintiff visited the emergency room complaining of back pain that had started four days prior (Tr. 106).  Robert Perry, M.D. assessed lumbosacral pain, but he ruled out a lumbosacral sprain.  (Tr. 110).  Dr. Perry doubted that Plaintiff had any radiculopathic process (Tr. 110).  Laboratory data showed no acute fractures or dislocations in the T-spine or lumbosacral spine, but did show osteoarthritic changes (Tr. 110).  Dr. Perry added Flexeril at 10mg to her current regimen of medications (Tr. 110).  Her medication regimen at the

time of the ER visit included Daypro at 600mg as well as hydrochlorothiazide, Claritin and vitamins (Tr. 109).  Dr. Perry also recommended that the Plaintiff avoid activity causing pain, have a physical therapy evaluation, and receive physical therapy treatment (Tr. 110).

Dr. Perry noted that Plaintiff has a "long-standing history of osteoarthritis," and that "most of the time her arthritis affects her knees and hips." (Tr. 109).  He also noted that Plaintiff "has never had any major problems with her back in the past (Tr. 109).  Dr. Perry reported that Plaintiff "takes Daypro for her arthritis and has done reasonably well with this." (Tr. 109).  He also stated that the "patient denied any recent trauma, she hasn't had any sudden onset of pain when she was lifting anything or any falls and no previous history of any herniated disk." (Tr. 109).  Dr. Perry reported that Plaintiff "has not had any pain radiating to either leg although she says that the pain goes down into the right buttock at times." (Tr. 109).

Dr. Perry performed a straight leg raising test which was negative for sciatica (Tr. 110).  He noted that there was no pain leaving the back and going to the leg (Tr. 109).  He stated that Plaintiff's pelvic compression was unremarkable for pain and that her pelvic rocking was unremarkable (Tr. 109).  He reported no point tenderness over the cervical, thoracic, or a lumbar spine, but noted that she had paraspinous tenderness greatest at about L3 to the SI joint on the right side (Tr. 109).  Dr. Perry noted that the Plaintiff had "full range of motion of the hips, knees, ankles and toes." (Tr. 109).  He recorded that the Plaintiff had "full range of motion of the cervical, thoracic and lumbosacral spine." (Tr. 109).

At this November 24, 1997 ER visit, the Plaintiff underwent x-ray tests, which were analyzed by P.D. Every, M.D. (Tr. 107-108).  Dr. Every's impression of Plaintiff's thoracic spine was "diffuse moderate spondylosis." (Tr. 107).  He noted that "no significant intervertebral disk

5

space narrowing is present." (Tr. 107). In her lumbar spine, Dr. Every's impression was "very mild scattered degenerative changes." (Tr. 108). He noted "mild sclerosis" in the facet joint and the SI joints, and that "no significant intervertebral disk space narrowing is present but Schmorl's nodes are identified on several of the vertebral end-plates." (Tr. 108). He also noted "very minor early" anterior spondylosis in the lower thoracic and lumbar spine (Tr. 108).

Plaintiff followed up her ER visit by visiting neurologist David Lee, M.D. between November 1997 and January 1998 to treat pain in her lower back and right leg (Tr. 143-145). Dr. Lee's examination results were not suggestive of "radiculopathy or myelopathy," but he did note mild pain and spasm in the posterior neck and lumbar areas (Tr. 144). He also performed a straight leg raising test that he found mildly positive on the right side (Tr. 144). He also found Plaintiff had good power in the upper and lower limbs (Tr. 144). Dr. Lee also noted occasional weakness in the right leg and numbness involving the right foot (Tr. 144).

To treat Plaintiff's symptoms, Dr. Lee reduced Plaintiff's Flexeril dosage and additionally prescribed Naprosyn to be followed by Cataflam (Tr. 144). Plaintiff reported to Dr. Lee that the medications helped her back and leg pain (Tr. 144), but he also started Plaintiff on an outpatient physical therapy program (Tr. 143). Plaintiff reported to Dr. Lee that physical therapy did help her back pain (Tr. 143).

At a follow-up examination in mid January 1998, Plaintiff still reported lower back pain with radiation down the right leg and pain in the interscapular area (Tr. 143). Dr. Lee's examination revealed mild pain and spasm in the lumbar area and no pain in the posterior neck and interscapular area (Tr. 143). During his exam, he also found good power in all four limbs as well as symmetrical deep tendon reflexes and flexor plantar responses (Tr. 143). He noted that

the Plaintiff was ambulatory, and then he recommended that Plaintiff continue outpatient physical therapy and prescribed Flexeril and Naprosyn (Tr. 143).  After the mid-January appointment, Plaintiff did not return for two scheduled appointments with Dr. Lee (Tr. 143).

On February 18, 1999, orthopedic surgeon C.P. Ramaswamy, M.D., examined Plaintiff, and diagnosed her with osteoarthritis of the lumbar spine (Tr. 166).  He noted that the Plaintiff had complained about upper and lower back pain for "about a year." (Tr. 165).  Dr. Ramaswamy's examination of Plaintiff's back revealed "very little tenderness" and "very little muscle spasm." (Tr. 165).  The examination also revealed a "satisfactory" range of movement of the lumbar and thoracic spines (Tr. 166).  Straight leg raising tests were negative, and Dr. Ramaswamy noted that the Plaintiff's gait was normal, that she was able to walk on her toes and walk on her heels (Tr. 166).  He reported that the x-rays from November 24, 1997, revealed some osteoarthritic changes, and that an x-ray of the lumbar spine showed slight scoliosis and osteoarthritic changes, but no compression of the vertebra, no narrowing of the disc spaces, and no fracture or dislocation (Tr. 166).  Dr. Ramaswamy reviewed the Plaintiff's CT scan of February 13, 1996, and stated that it did not reveal any abnormalities (Tr. 166).  Dr. Ramaswamy did note that the Plaintiff had tumors removed from her right hip in 1987 and 1992 (Tr. 165).

On July 17, 2002, radiologist J. Manalang, M.D., surveyed an x-ray of Plaintiff's cervical and lumbar spine (Tr. 315).  Dr. Manalang's impression for the Plaintiff's cervical spine was a loss of normal lordosis but no acute bony process (Tr. 315).  He noted minimal hypertrophic spurring, anterior margin of the body of C6, straightening of the normal lordosis, and that the visualized vertebra were intact (Tr. 315).  Dr. Manalang's impression for the Plaintiff's lumbar spine was minimal hypertrophic spurring, but that it was otherwise a normal study (Tr. 315).  He

7

noted minimal hypertrophic lipping involving several vertebral bodies, but that the vertebrae were intact and otherwise normal in appearance (Tr. 315). He noted that the interspaces were well maintained and within alignment and the sacroiliac joints were unremarkable (Tr. 315).

On February 25, 2003, Plaintiff saw orthopedic surgeon Alan Froehling, M.D., who observed that Plaintiff's upper extremities had a "full range of motion" and that her lower extremities had a normal pulse, showing "no evidence of foot drop or weakness." (Tr. 322). He noted a full range of motion of the cervical spine and that palpatation over the thoracic and lumbar regions elicited complaints of pain, but there was no heat, redness, or swelling (Tr. 322). Plaintiff's lumbar spine had 80 degrees of forward flexion, 10 degrees of extension, and 10 degrees of lateral motion (Tr. 322). Dr. Froehling did note Plaintiff's complaints of pain in the lower back during the range of motion testing and during palpitation over the thoracic and lumbar regions (Tr. 322). He reported a "normal rotation of both hips, without impairment or spasm." (Tr. 322). He noted normal pulses in the lower extremities with no ulcerations and reported no sensory or motor loss in the lower extremities (Tr. 322). Dr. Froehling reported that Plaintiff was able to walk on her tiptoes and was able to walk on her heels (Tr. 322). He also noticed that Plaintiff was "ambulatory" with no "gait abnormality" and that she does not limp or require an assistance device (Tr. 322). He reported that straight leg raising was negative (Tr. 322).

Dr. Froehling's staff conducted a clinical test called a Materials Handling Assessment (Tr. 324). According to the Materials Handling Assessment, Plaintiff could push/pull, pivot/carry and lift platform to waist a load of fifteen pounds, and could lift, waist to above head, a load of eight pounds (Tr. 324). She also performed repetitive stacking in a cardboard

8

simulation, where she pivoted and carried various sizes and weights of cardboard, which weighed from a few ounces to several pounds (Tr. 324). The Plaintiff also demonstrated good/fine motor activity and good eye/hand coordination by utilizing small tweezers (Tr. 324).

### *RFC Assessments*

There were residual functional capacity (RFC) assessments from five doctors in this case. On January 6, 1998, Julio M. Pardo, M.D., examined Plaintiff's medical records and diagnosed her with arthritis (Tr. 134). Dr. Pardo found no objective medical evidence to permit a determination that the Plaintiff had physical limitations (Tr. 134). On May 5, 1998, Earl W. Donelan, M.D., examined Plaintiff's medical record for the state agency and diagnosed her with mild degenerative changes in her lumbar spine and right hip pain (Tr. 126). He opined that Plaintiff did not have a severe physical impairment (Tr. 127). Dr. Donelan did not otherwise fill out anything else on the RFC assessment form (Tr. 126-133).

The Plaintiff's treating physician Dr. Palines, an internist, completed an RFC on October 13, 1998 (Tr. 158-161). He stated that the Plaintiff suffered from chronic low back pain (Tr. 158). He based his assessment on the February 1996 CT scan, a positive straight leg raising, and Dr. Lee's consultation (Tr. 158). Dr. Palines stated that Plaintiff could stand, walk, sit, or sit and/or stand in combination for a total of zero hours in an eight-hour workday (Tr. 158). He also noted that the Plaintiff could walk one-half a block to one block before she needed to sit (Tr. 158). He further reported that Plaintiff needed to lie down every fifteen minutes to perform these activities (Tr. 159). Dr. Palines stated that the Plaintiff could lift and carry a maximum of ten pounds only "occasionally" during an eight-hour workday, and that Plaintiff could never climb stairs/ladder or stoop (Tr. 159). He stated Plaintiff could occasionally reach above shoulder

9

level and operate foot controls, and that Plaintiff could not use her hands or arms for repetitive pushing/pulling (Tr. 160). Dr. Palines also reported that the plaintiff could use her hands and arms for repetitive action involving simple grasping and fine manipulating (Tr. 160). He described Plaintiff's pain in her lower back and right hip as "severe," and as "constant." (Tr. 160-61). He determined that nothing precipitated the pain because it was constant (Tr. 161).

Consulting physician Dr. Ramaswamy completed an RFC assessment on February 18, 1999 (Tr. 161-164). Dr. Ramaswamy stated that Plaintiff could occasionally lift and/or carry a maximum of ten pounds for a total of about one-third of an eight-hour workday and could frequently lift and/or carry a minimum of ten pounds for a total of about two-thirds of an eight-hour workday (Tr. 162). Dr. Ramaswamy reported that Plaintiff "cannot stand for more than ten to fifteen minutes at a time" and that Plaintiff can only sit for ten minutes without interruption (Tr. 163). He further stated that Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl (Tr. 163). The clinical finding used to support his opinion was "back pain." (Tr. 163). He stated that the Plaintiff's ability to reach, handle, feel, push/pull, see, hear, and speak were not limited because they do not hurt her back (Tr. 164). He also stated that heights and moving machinery were restricted because the Plaintiff was afraid of heights (Tr. 164). No other environmental restrictions were noted because the other restrictions did not hurt her back (Tr. 164). Dr. Ramaswamy did not respond when asked whether the diagnosis was confirmed by objective findings or if the diagnosis was based primarily on the patient's subjective complaints (Tr. 164). When he was asked whether the opined limitations were normally expected from the type and severity of the diagnosis in this case, he stated "possibly yes." (Tr. 164).

At the hearing, the ALJ requested an RFC assessment from Plaintiff's treating physician and a consulting physician (Tr. 270). On December 30, 2002, Plaintiff's treating physician, Dr. Ramirez, completed an RFC assessment (Tr. 317-321). Dr. Ramireiz stated that Plaintiff had suffered from chronic hip, knee and back pain since 1996 (Tr. 317). Dr. Ramirez based her assessment on the February 1996 CT scan and the July 1996 x-ray as per Dr. Lee's consultative examination (Tr. 317). Dr. Ramirez stated that Plaintiff could only stand, walk, or sit for fifteen to thirty minutes on a sustained five-day per week basis, in an eight-hour workday (Tr. 318). She also stated that Plaintiff could only sit or stand for ten to fifteen minutes at a time (Tr. 318). Dr. Ramirez further reported that Plaintiff could not complete an eight-hour workday without an opportunity to lie down or recline every fifteen minutes (Tr. 318). She stated that Plaintiff could never climb stairs/ladder or stoop, and that Plaintiff could occasionally reach above shoulder level and operate foot controls (Tr. 318). Additionally, she stated that Plaintiff could lift or carry a maximum of ten pounds occasionally in a competitive work situation (Tr. 319). She reported that Plaintiff could not use her hands or arms for repetitive pushing or pulling, but that she could use her hand or arms for simple grasping and fine manipulating (Tr. 320). She characterized Plaintiff's pain in the lower back, hip and knees as moderately severe to severe (Tr. 320). Dr. Ramirez reported that Plaintiff was in constant pain and received only slight relief from medications (Tr. 320). She also reported that Plaintiff occasionally complained of increased sleepiness from taking her medications, and she noted that the Plaintiff had been seen at the clinic since 1996 (Tr. 317, 320).

On February 25, 2003, consulting physician Dr. Froehling completed an RFC assessment based on his observations as well as Plaintiff's Materials Handling Assessment (Tr. 325-328).

Dr. Froehling opined that Plaintiff could "occasionally" lift and/or carry fifteen pounds, and could "frequently" lift and/or carry less than ten pounds (Tr. 325). He further opined that Plaintiff could "stand and/or walk" as well as "sit" for about six hours in an eight-hour workday (Tr. 325). He limited Plaintiff's ability to push and/or pull in the upper extremities to fifteen pounds, but did not limit the lower extremities (Tr. 326). He used the Plaintiff's demonstrated ability in the clinic as clinical findings to support his conclusions (Tr. 326). Dr. Froehling assessed that Plaintiff's postural limitations meant that she could climb, balance, kneel, crouch, crawl, or stoop only "occasionally." (Tr. 326). Dr. Froehling opined that her manipulative functions and her visual/communicative functions were unlimited (Tr. 326).

## DISCUSSION

**Legal Standard**

To receive disability benefits or supplemental security income, a claimant must be "disabled." A disabled person is one whose physical or mental impairments result from anatomical, physiological, or psychological abnormalities which can be demonstrated by medically acceptable clinical and laboratory diagnostic techniques and which prevent the person from performing previous work and any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A), 1382c(a)(3)(B), 1382c(a)(3)(D) (2006).

The Social Security regulations provide for a five-step sequential inquiry that must be followed in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920 (2006). The Commissioner must determine in sequence: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the impairment

meets or equals one listed by the Commissioner, (4) whether the claimant can perform his or her past work, and (5) whether the claimant is capable of performing any work in the national economy. Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at Step 5 to show that the claimant can perform some other job. Id.

Under the Social Security Act, a court must sustain the Commissioner's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" of proof; the standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Butera v. Apfel, 173 F.3d 1049, 1055 (7th Cir. 1999). In addition, the ALJ must build a bridge of logic connecting the evidence to the conclusions that support the decision. Groves v. Apfel, 148 F.3d 809, 811 (7th Cir. 1998). Because the Commissioner is responsible for weighing the evidence, resolving conflicts in the evidence, and making independent findings of fact, this Court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. Id. However, this Court does not defer to conclusions of law, and if the Commissioner makes an error of law or serious mistakes, reversal is required unless this Court is satisfied that no reasonable trier of fact could have come to a different conclusion. Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996).

**The ALJ's Credibility Determination**

A reviewing court will reverse the ALJ's determination of a Plaintiff's credibility only if it is "patently wrong." Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). An ALJ must "articulate specific reasons for discounting a claimant's testimony as being less than credible."

Schmidt v. Barnhardt, 395 F.3d 737, 746 (7th Cir. 2005).  When the "ALJ gives specific reasons that are supported by the record for his finding" this Court will affirm the credibility determination. Skarbek v. Barnhart, 390 F.3d 500, 505 (7th Cir. 2004).  An ALJ is precluded from "'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." 395 F.3d at 746-47.

      The ALJ must consider symptoms of pain and the extent to which pain symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. §404.1529 (2006).  The objective medical evidence includes medical signs and laboratory findings as defined in 20 C.F.R. 416.928(b) and (c).  Other evidence includes statements or reports from the claimant, treating physician and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how the impairments and any related symptoms affect ability to work. Id. at 416.929(a).  In evaluating the intensity and persistence of pain, the ALJ must consider all of the available evidence, including medical history, medical signs and laboratory findings, and statements about how the symptoms affect the claimant. Id. at 416.929(a).

      In this case, the record demonstrates that the ALJ's determination of the Plaintiff's credibility is not "patently wrong."   The ALJ gives "specific" reasons for his determination. The ALJ noted that the Plaintiff had explored relatively few treatment options (Tr. 215).  The ALJ stated that "early in the course of the [Plaintiff's] back and knee pain. . . physical therapy and exercises improved her functioning and her level of pain" but that the "record does not establish why the [Plaintiff] did not continue some sort of exercise program at home."  This is a

relevant factor under 20 CFR §416.929(c)(3)(v). The record shows no other treatment options either pursued by the Plaintiff or prescribed by her doctors.

The ALJ reasoned that the Plaintiff's daily activities were "consistent with an ability to do light work." (Tr. 215). The ALJ stated that the Plaintiff's daily activities were limited because of "self-imposed limitations." (Tr. 215). He noted that the Plaintiff "makes the bed, takes care of her personal needs and does housework" with "no one to assist her." (Tr. 215). The ALJ reasoned that "she is able to live alone, manage her own affairs and take care of all her personal and household needs." (Tr. 216). Evidence of daily activities is a relevant factor under 20 CFR §416.929(c)(3)(I). Plaintiff testified that she lived alone and that she cooked meals occasionally, did her own dishes, did her laundry made her own bed, and does all the household chores (Tr. 245, 252).

The ALJ further reasoned that the Plaintiff's treating physicians "have not advised her to limit her activities in any way and she has no medically demonstrated impairment that would warrant activity restriction." (Tr. 216). This is an appropriate consideration under the regulations. 20 C.F.R. § 416.929(c)(3)(v). This argument is borne out by the record. The only example of the treating physicians limiting her activity in any way is the April 23, 2002 treatment notes which state that the Plaintiff was "instructed on dietary modification." (Tr. 288). Thus, the ALJ gives "specific" reasons and his determination is not patently wrong.

Additionally, the Plaintiff argues that the ALJ erred in finding the Plaintiff complaints as to the side effects of her medication only marginally credible. The side effects of medication is a relevant factor that the ALJ must consider. 20 CFR 416.929(c)(3)(iv); SSR 96-7p. The ALJ reasoned that "[a]lthough the claimant may experience some degree of sleepiness as she

described, this has not been fully brought to the attention of her general practitioner to see if her regime to [sic] be changed so that she could be less sleepy." (Tr. 215). The ALJ also stated that "[t]he only negative side effect mentioned has been some drowsiness, which was addressed by switching...to a new medication." (Tr. 215).

The Plaintiff testified at the hearing that she took Vioxx, Univasc, Covera HS Darvocet 25, Ultravate and Tylenol #3 (Tr. 248-249). She said the only medication that made her drowsy was the Tylenol #3 (Tr. 239). However, she did not take Tylenol #3 on a regular basis, but only when she was in the most amount of pain (Tr. 239). She stated that it relaxed her and helped her sleep (Tr. 239). The Plaintiff complained of drowsiness to her treating physician on only one occasion (Tr. 291). Again, the only medication that she complained of was the Tylenol #3 (Tr. 291), and Dr. Ramirez instructed her to only take the Tylenol #3 sparingly and in between attacks, and to otherwise just take plain acetaminophen (Tr. 291).

The Plaintiff further argues that the ALJ did not consider his own observation of the Plaintiff's sleepiness at the hearing. At the beginning of the hearing, the ALJ observed that the Plaintiff looked "rather sleepy." (Tr. 234). The Plaintiff replied that she felt "drugged up" because she took her medication (Tr. 234). Plaintiff argues this is in violation of the Seventh Circuit rule that an ALJ "cannot choose and focus on that evidence that supports his conclusion but must consider all relevant evidence of record." (Pl. Br. 6). However, the ALJ is not required to discuss every piece of evidence. Rohan v. Chater, 98 F.3d 996, 971 (7th Cir. 1996).

The ALJ's finding is supported by substantial evidence, and his credibility determination concerning Plaintiff's testimony is not "patently wrong."

**The ALJ Did Not Err by Giving Controlling Weight to a Non-Treating Physician's Opinion**

Plaintiff argues that the ALJ erred in relying on the functional capacity assessment of Dr. Froehling, rather than the assessments of Plaintiff's treating physicians.  Social Security Ruling 96-2 states that "[c]ontrolling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." SSR 96-2p.  The ruling further states that even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it is also "not inconsistent" with the other substantial evidence in the record. SSR 96-2p; see also 20 CFR 404.1527(d)(2); White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005).

On the other hand,, an ALJ is not precluded from relying on the opinions of consulting physicians.  See Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004).  The Seventh Circuit has even stated that "a consulting physician's opinion might have the advantages of both impartiality and expertise" because of "the biases that a treating physician may bring to the disability evaluation" as well as the treating physician's potential inability to "appreciate how her patient's case compares to other similar cases."  Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001).

The ALJ gave the assessment by Dr. Palines, a treating physician, "minimal weight." (Tr. 212).  The ALJ stated that Dr. Palines' functional capacity assessment of Plaintiff would render her "almost bed bound, with no ability to stand or sit for even an hour total during a regular eight-hour workday." (Tr. 212).  The ALJ found the level of treatment provided by Dr. Palines to be inconsistent with this extremely limiting functional capacity assessment (Tr. 212).  He noted that Dr. Palines did not order objective medical tests, did not prescribe an assistive device or

wheelchair, did not record the claimant's inability to walk, and did not refer Plaintiff to a neurological or orthopedic specialist (Tr. 212).  Section 404.1527 of Title 20 of the Code of Federal Regulations states that the Social Security administration "will look at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories."  20 C.F.R.§ 404.1527(d)(2)(ii).  The ALJ stated that Dr. Palines "simply renewed medication when asked." (Tr. 212).  The ALJ called Dr. Palines's treatment notes "very brief." (Tr. 212).  According to the regulations, the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight the Commissioner will give that opinion. 20 C.F.R. § 404.1527(d)(3).  The regulations state that the Commissioner "will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories."  20 C.F.R. 404.1527(d)(2)(ii).  A review of Dr. Palines' treatment notes bears out the ALJ's evaluation.  Furthermore, the ALJ also remarked that "it appears his opinion is nothing more than a recitation of the claimant's subjective complaints." (Tr. 212).  The Seventh Circuit has found this to be a reason to deny controlling weight to a treating physician's opinion. White v. Barnhart, 415 F.3d 654, 659 (2005).  Therefore, the ALJ did not err.

     Additionally, the ALJ gave Dr. Ramirez's functional capacity assessment "little weight." (Tr. 213).  The ALJ reasoned that the treatment notes recorded by Dr. Ramirez, a treating physician, did not support the limitation of Plaintiff having to lie down every fifteen minutes (Tr. 213).  Moreover, the ALJ stated that Dr. Ramirez's treatment notes did not reflect Plaintiff needing to lie down every fifteen minutes during appointments or while waiting in the reception

area (Tr. 213).  The regulations generally state that the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion. 20 C.F.R. § 416.927.   The ALJ further noted that Dr. Ramirez is an internist, and not an orthopedic specialist (Tr. 213).  The Commissioner generally gives more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. 20 C.F.R. 404.1527(d)(5).  He stated that objective tests reveal only minimal impairment (Tr. 213).

The ALJ gave the functional capacity assessment of orthopedic specialist Dr. Froehling, a non-treating physician, the "most weight" (Tr. 215).  The ALJ reasoned that Dr. Froehling's opinion was entitled to greater weight because he was an orthopedic specialist, whereas Dr. Ramirez was an internist (Tr. 213).  Further, the ALJ noted that Dr. Froehling based his functional capacity assessment on Plaintiff's performance on an objective materials handling test (Tr. 215).  The regulations explain that "the weight [given] to [the opinion of non-examining sources] will depend on the degree to which these opinions provide supporting explanations for their opinions." 20 C.F.R. § 404.1527.

In each instance, the ALJ did not err by giving controlling weight to a non-treating physician's opinion.

**X-Ray Evidence**

Plaintiff's argument that the ALJ relied on x-ray evidence "only" is not entirely clear. The ALJ did mention the CT Scan evidence in his opinion when he was reciting Plaintiff's medical history (Tr. 211).  Dr. Ramaswamy, who reviewed the CT Scan, diagnosed "osteoarthritis of the lumbar spine." (Tr. 166).  The ALJ adopted the diagnosis of osteoarthritis (Tr. 214).

The ALJ interpreted the objective tests generally as revealing "only mild findings." (Tr. 214).  He stated that physical examinations of Plaintiff generally show good range of motion of the extremities and cervical spine with some motion limitations in the lumbar spine (Tr. 214). The ALJ stated that Plaintiff was "neurologically normal." (Tr. 214).  He noted that Plaintiff's most recent straight leg raising test was negative (Tr. 214).  Therefore, there is no reason to believe that the analysis was not based on the medical evidence and all of the objective evidence on the record.

## CONCLUSION

In this case, the Court must sustain the Commissioner's findings because they are supported by substantial evidence.  The ALJ built a bridge of logic connecting the evidence to the conclusions that support the decision. Therefore, the Commissioner's final decision denying Eloise Hughes's application for Disability Benefits and Supplemental Security Income is **AFFIRMED** and Judgment is **GRANTED** in favor of Defendant and against Plaintiff.  The case is **DISMISSED** with prejudice.

**DATED: September 29, 2006**

*s/ Donald G. Wilkerson*
**DONALD G. WILKERSON**
**United States Magistrate Judge**
